Stock Yards National Bank of South St. Paul v. Commissioner.
Stock Yards Natl. Bank of South St. Paul v. Commissioner
Docket No. 111537.
United States Tax Court
1944 Tax Ct. Memo LEXIS 265; 3 T.C.M. (CCH) 424; May 5, 1944
*265 Held, the record does not establish that the transaction by which the petitioner, a subsidiary of Northwest Bancorporation, acquired two farms by transfer from Stock Yards Mortgage Co. constituted a reorganization under the provisions of section 112 (g) (1) (C) of the Revenue Act of 1938. Grant W. Anderson, Esq., c/o Northwestern Nat. Bank & Tr. Co. of Minneapolis, Minneapolis, Minn., for the petitioner. Edward C. Adams, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $2,839.20 in the petitioner's income tax for the year 1939. The sole issue now in controversy is the deductibility of losses sustained by the petitioner on the sale of two farms. The decision of this issue rests on the determination of whether or not a reorganization was effected upon the transfer of certain assets of the Stock Yards Mortgage Company to the petitioner and the assumption of the transferor's debts by the petitioner. The transferor also transferred its insurance business to the Union Investment Company, the petitioner's nominee. The two companies and the petitioner were all subsidiaries of the Northwest Bancorporation. Findings *266 of Fact Certain facts were stipulated and as so stipulated are adopted as findings of fact. Their material portions are as follows: The petitioner is a banking corporation organized in 1897 under the banking laws of the United States. Its principal office is in South St. Paul, Minnesota. It filed its income tax return for the year 1939 with the collector of internal revenue for the district of Minnesota. On March 28, 1938 the Northwest Bancorporation, hereinafter called Northwest, owned 2,450 shares of the petitioner's common stock, and five individuals each owned 10 shares thereof. The Reconstruction Finance Corporation owned 500 shares of the petitioner's Class A preferred stock. Each share of common and preferred stock had a par value of $100 a share. The shares just enumerated were all of the issued and outstanding shares of the petitioner. On March 28, 1938 Northwest owned 492 shares of the stock of the Stock Yards Mortgage Company, hereinafter called the Mortgage Company, and four individuals owned an aggregate of 8 shares thereof, the 500 shares being all of the issued and outstanding stock of the Mortgage Company. On March 28, 1938 the petitioner and the Mortgage Company *267 had their offices and place of business in the same quarters in the Exchange Building in South St. Paul. On that date and for many years prior thereto Union Investment Company, hereinafter called Union, was a wholly-owned subsidiary of Northwest. Northwest is a Delaware corporation, licensed to do business in Minnesota, and has its principal place of business in Minneapolis, Minnesota. The Mortgage Company was organized on May 24, 1916, under and pursuant to Chapter 58 of the Revised Laws of Minnesota for the year 1905, and the several acts amendatory thereof and supplemental thereto. In accordance with its Articles of Incorporation as amended on October 28, 1924, the Mortgage Company was authorized to conduct business as follows: "The general nature of the business of this corporation shall be and is loaning and investing money, purchasing notes, bonds, mortgages, securities and other evidence of indebtedness and the selling and assigning of same; to acquire, use, improve, mortgage, lease, sell and convey real and personal property; to write, as agents, insurance and surety bonds of all kinds; and to exercise, in respect to any corporate share or shares of stock lawfully acquired, *268 all the rights of ownership thereof, including the right to vote the same and do any and all things necessary and incidental to the carrying out of the business herein set forth." During the period of time from its original incorporation up to approximately the year 1930 the Mortgage Company was engaged primarily in the business of the making or purchasing of real estate mortgages or real estate mortgage bonds for resale to investors, and the real estate hereinafter described as the Stebbens farm and the McBride farm was acquired by foreclosure of real estate mortgage loans made or purchased by it. On March 28, 1938 the Mortgage Company was indebted to the petitioner in the amount of $29,500. On March 28, 1938 the Mortgage Company's assets and liabilities were shown on its books as follows: Cash in Stock Yards National Bank
$11,045.21
Accounts receivable
12,699.49
Real Estate
30,085.53
D. M. Connolly loan
2,000.00
Miscellaneous receivables
(54.20)
Total
$55,776.03
Capital Stock
$50,000.00
Undivided Profits
(35,786.37)
Accounts payable, insurance business
10,062.40
Notes payable, Stock Yards National
Bank
29,500.00
Reserve, Randal-Davis loan (secured
by D. M. Connolly loan, above)
2,000.00
Total
$55,776.03
*269 On March 28, 1938 the directors of the Mortgage Company authorized the transfer of all of its assets to the petitioner, in full settlement of its indebtedness to the petitioner. They further adopted a resolution calling for the dissolution of the corporation. On the same day a proposal to make such transfer to the petitioner or its nominees was made by the Mortgage Company to the petitioner and accepted by the latter. The proposal provided that the petitioner or its nominees should assume the transferor's liability for its accounts payable. Pursuant to the proposal, as accepted, the Mortgage Company assigned and transferred all of its assets to the petitioner and to its nominee, Union. The insurance business was transferred to Union, which assumed the liabilities of the Mortgage Company on its accounts payable. The Mortgage Company's indebtedness of $29,500 to the petitioner was cancelled. Among the assets so transferred to the petitioner were the Walter Stebbens farm and the McBride farm, which were sold by the petitioner in 1939 for $100 and $1,209.50, respectively. The Mortgage Company thereupon was dissolved. The fair market values of these farms when transferred to the petitioner *270 in 1938 were $100 and $1,209.50, respectively. In its income tax return for 1939 the petitioner claimed losses aggregating $16,155.16 upon the sale of the two farms. It computed its losses by assigning $14,864.66 and $2,600, respectively, as the cost of the Stebbens and McBride farms to the Mortgage Company and subtracted the sale prices of $100 and $1,209.50, respectively, leaving losses of $14,764.66 and $1,390.50 from the sale of the two farms, or an aggregate loss of $16,155.16. In their income tax returns for 1938 no gain or loss was reported by the petitioner or the Mortgage Company resulting from transactions whereby the Mortgage Company transferred its assets to the petitioner and Union. In his notice of deficiency the respondent disallowed the loss of $16,155.16, with the following explanation: "These farms together with other assets less liabilities were received by you in March 1938 in settlement of account with the Stock Yards Mortgage Co. A completed transaction was effected in 1938, and it is held that the value of farms when acquired constitutes their cost basis. Such value has been determined as being equivalent to the selling price in 1939. Accordingly no losses *271 for income tax purposes were sustained on these sales." The record discloses the following additional facts: Northwest was a holding company which owned the controlling stock in 85 banks and six or seven companies. Its policy was to liquidate as many of its subsidiary companies as possible. In line with that policy Northwest decided to eliminate the Mortgage Company, and turned over its assets to the petitioner and its insurance business to Union. After the transfer the petitioner owned the real estate and Union continued to own and operate the insurance business, both formerly owned by the Mortgage Company. The Stebbens farm was acquired by the Mortgage Company on October 23, 1922, by the purchase at a foreclosure sale for $13,230.15. Until December 31, 1937 the value of the farm was carried on the Mortgage Company's books at $14,864.66. The McBride farm was purchased on May 19, 1932, by the Mortgage Company at a foreclosure sale for $3,672.90. Subsequently the Mortgage Company sold the farm at a contractor's sale, the purchaser defaulted, and the Mortgage Company cancelled the contract. Thereafter, until December 31, 1937, the Mortgage Company carried the value of the farm on *272 its books at $2,600. On December 31, 1937 the Mortgage Company made certain "adjustments" on its books. It charged off all of its real estate assets to undivided profits at an aggregate valuation of $7,773.18. It then "revalued" all such real estate at $33,381.53. No segregation was made of the several items of real estate, including the Stebbens and the McBride farms. Opinion VAN FOSSAN, Judge: The question here involved is the amount of loss, if any, on the sale of certain property. The answer turns on the determination of the basis of the property. The basis of the property depends on whether or not the transaction of March 28, 1938, whereby the Mortgage Company transferred all of its assets to the petitioner and its nominee, constituted a reorganization giving rise at the time to no recognizable gain or loss as contemplated by the provisions of sections 112 and 113 of the Revenue Act of 1938. The petitioner contends that the transaction came squarely within the statutory definition of a reorganization as found in section 112 (g) (1) (C) of the Revenue Act of 1938. Since petitioner has pitched its whole case on this contention, if it be concluded that the transaction does not *273 fall within this section, then respondent's action must be approved. Section 112 (g) (1) (C) defines a reorganization in the terms of control, it being provided that a reorganization means "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred." Section 112 (h) defines control as follows: "As used in this section the term 'control' means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation." Both parts of the definition must be satisfied. There must exist 80 per cent control of all voting stock plus 80 per cent control of the total number of shares of all other classes of stock of the corporation. The last quoted provision raises an insuperable barrier to petitioner's contention. Northwest owned more than 80 per cent of the petitioner's common stock. But the Reconstruction Finance Corporation owned all of the preferred stock. *274 The record does not reveal whether or not the preferred stock was voting stock so as to come within the first 80-per cent provision. Such a fact can not be assumed. If any assumption were to be made it would be that the preferred stock was non-voting. In any event, the fact is not proven. On the state of the record it would appear that the shareholders (Northwest) of the transferor (the Mortgage Company) owned 80 per cent of the common stock (presumptively the voting stock) of petitioner but that they did not own 80 per cent of the total number of shares of all other classes of stock. This defect is fatal to petitioner's position and makes unnecessary further consideration of petitioner's contention. The transaction in question has not been proved to be a reorganization under the cited section. No other non-recognition provision of the statute is claimed to be pertinent. Were such contention made it may be pointed out that there is no proof of a "plan of reorganization." Mindful of the cases holding that there need not be a formal or express plan, nevertheless from the transaction itself it must be possible to spell out a real plan. Here there is none. At most there was a policy *275 to "get rid of" the minor companies, to take over their assets and liquidate them so as to achieve a "more compact condition and confine it as far as possible to the bank operation." Various means of accomplishing this end were available. The record does not establish the existence of a real plan of reorganization in the present instance. Decision will be entered for the respondent.